**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **BEAU GALYEAN,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:21-CV-1287-BJ** |
| | § | |
| **THOMAS GUINN,** | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiff Beau Galyean ("Galyean")'s Motion for Judgment on the Verdict [doc. 311–1] and Declaratory Judgment [doc. 311–2], Defendant Thomas Guinn ("Guinn")'s Brief on the Defenses Reserved for the Court [doc. 317–1] and Declaratory Judgment [doc. 317–2], and Guinn's Supplemental Motion for Sanctions [doc. 233]. For the reasons stated herein, on Guinn's Defenses Reserved for the Court [doc. 317–1], the Court finds that: (1) the statute of frauds defense applies to, and renders unenforceable, the contract found by the jury; (2) the partial-performance exception to the statute of frauds defense does not apply; and (3) the quasi-estoppel defense does not apply. Further, the Court finds that: (1) Galyean's Motion for Judgment on the Verdict [doc. 311–1] is **DENIED**; (2) Galyean's Motion for Declaratory Judgment [doc. 311–2] is **DENIED IN PART** and **GRANTED IN PART**; (3) Guinn's Motion for Declaratory Judgment [doc. 317–2] is **DENIED IN PART** and **GRANTED IN PART**; and (4) Guinn's Supplemental Motion for Sanctions [doc. 233] is **DENIED**.

**I.   INTRODUCTION**

This case has plunged this Court into a deep dive into the world of cutting horses. On one side, Plaintiff Beau Galyean is a nationally-renowned cutting horse trainer with an equally distinguished record competing in the Western sport of cutting. On the other, Defendant Thomas

1

Guinn is a successful Mississippi businessman who entered into the world of cutting horses upon his retirement from the business industry.

In this case, it has been alleged by Galyean that there is a long-standing tradition in the horse business of forming oral partnerships with undisclosed owners. If true, it is evident to the Court that most of these partnerships seemingly work themselves out without court intervention.[1] However, when the relationship between the parties deteriorates, as is the case here, a legal nightmare ensues. If ever there was doubt as to the wisdom of putting contractual agreements in writing, this case should put such doubts to rest.

Unlike many of the cases involving oral partnership agreements in other contexts, Galyean and Guinn do not simply disagree about some of the terms of the partnership, but, rather, whether the partnership was ever formed. Guinn's position that there was no partnership agreement has, in effect, given Galyean *carte blanche* to allege what the terms of the partnership agreement were. As such, Galyean has alleged so many different—and often irreconcilable—terms, that it took a monumental effort by the jury to reach their verdict finding that a partnership existed and that certain terms were a part of that partnership agreement. Despite the jury's verdict, as evidenced by the post-trial submissions, the parties still disagree about the existence and terms of the partnership. Consequently, the following are the facts in the light most favorable to the jury verdict.

## II.    FACTS

Galyean first met Guinn in or around early 2015 when Guinn brought some horses to Galyean's father. (ECF 306 at 156; ECF 307 at 10).[2] At Galyean's recommendation, Guinn

---

[1] Indeed, there is scant caselaw involving alleged oral partnership arrangements in the horse ownership context. In fact, the parties have not provided the Court with any analogous cases from any state or federal jurisdiction.

[2] ECF refers to the Electronic Case Filing System used by the Court.

purchased two cutting horses, Metallic Rebel, in 2015, and Rollz Royce, in 2017.  Metallic Rebel and Rollz Royce (collectively the "Stallions"), were the subject of an oral partnership between Galyean and Guinn.  (ECF 298 at Question 1, Question 3).  The partnership was formed with the purpose of "build[ing] a brand of horses that would be capable of earning high breeding fees." (*See* ECF 306 at 24 (Plaintiff's Opening Statement); *see also* ECF 271 at 5 (Plaintiff's Trial Brief); ECF 25 at 1–2 (Live Complaint)).  The terms of the oral partnership were that "Galyean would manage and care for the Stallions, contribute money and property and incur losses for their care, ride the horses professionally, and in return Galyean received reimbursement for some costs, 50% of the prize money from competitions, and 25% of operational profits."  (ECF 298 at Question 10). This partnership was successful by all possible metrics and continued until July 2021, when Guinn removed the Stallions from Galyean's ranch.

On October 7, 2021, Galyean filed his Original Petition against Guinn in the 67th District Court, Tarrant County, Texas.  (ECF 1 at Exhibit A).  Guinn removed the case, based on diversity jurisdiction, to this Court on November 22, 2021.  (ECF 1).  On November 8, 2022, after nearly a year of motion-heavy practice, the parties consented to a trial before the undersigned.  (ECF 203). The trial began on July 10, 2023, and a verdict was rendered by the jury—in favor of Galyean— on July 14, 2023.  (*See* ECF 298, 304–10).  On August 7, 2023, the parties submitted a joint proposed order, that was accepted by the Court, setting post-trial deadlines for motions and briefs. (ECF 303, 316).  Subject to the deadlines in the aforementioned order, Galyean filed his Motion for Judgment on Verdict and Declaratory Judgment [doc. 311] on August 8, 2023, and Guinn filed his Trial Brief on the Defenses Reserved for the Court & Declaratory Relief [doc. 317] on August 29, 2023.  Subsequently,—almost two months after the August 30, 2023, deadline—Galyean filed

an Amended Motion for Leave to File Third Amended Complaint [doc. 338] on October 18, 2023.[3]
On October 26, 2023, the Court held a hearing on those Motions.[4]

### III.   GUINN'S BRIEF ON THE DEFENSES RESERVED FOR THE COURT

In his Brief on the Defenses Reserved for the Court [doc. 317–1], Guinn argues that: (1) the statute of frauds bars the enforcement of the oral partnership; and (2) quasi-estoppel should prevent Galyean from asserting, in this case, a position that is inconsistent with his prior positions. (Defendant's Defenses Brief ("Def.'s Br.") at 3–16). In response, Galyean argues that the oral agreement falls outside of the statute of frauds and that Guinn has failed to establish the required elements of quasi-estoppel. (Plaintiff's Defenses Brief ("Pl.'s Br.") at 11–25). The Court will address each defense in turn.

### A.   The Statute of Frauds

At the parties' request, Guinn's statute of frauds defense—that performance of the agreement could not be completed within one year—was submitted to the jury as an advisory question.[5] (See ECF 298, 309 at 6). The jury, in its verdict, advised that it was possible for performance to be completed within a year.[6] (ECF 298 at Question 2). Guinn, nevertheless, argues

---

[3] The original motion for leave to amend was filed the prior day on October 17, 2023 [doc. 336].

[4] Galyean's Amended Motion for Leave to File Third Amended Complaint [doc. 338] was denied from the bench as untimely.

[5] Both parties submitted a proposed statute of frauds question, albeit with slightly different wording, in their pretrial jury submissions. During an informal jury conference, it became clear that the parties disagreed over the propriety of even submitting a question on the issue and a compromise of submitting an "advisory" question to the jury was reached.

[6] The Court "'is not bound by [an advisory] jury's findings, and is free to adopt them in whole or in part or totally disregard them.'" *Sullivan v. Towan Cos.*, 9552 F.2d 141, 147 (5th Cir. 1992) (quoting *In re Incident Aboard D/B Ocean King*, 758 F.2d 1063, 1071 (5th Cir. 1985)). While Galyean repeatedly states that the statute of frauds is an equitable defense and urges the Court to adhere to the jury's advisory finding, the Court notes that the statute of frauds is a legal defense which limits the enforcement of certain oral agreements and is a question of law for the Court to ultimately decide. Thus, the statute of frauds defense would not overturn the jury's finding of an oral partnership, but it would render that agreement unenforceable. *See, e.g., Micromedia v. Automated Broad. Controls*, 799 F.2d 230, 235 (5th Cir. 1986); *Walker v. Tafralian*, 107 S.W.3d 665, 671 (Tex. App.—Fort Worth 2003, pet. denied).

that his oral agreement with Galyean falls within the statute of frauds as a matter of law because it could not have been performed within a year. (Def.'s Br. at 3–11). Specifically, Guinn alleges that it was impossible for the parties to accomplish the stated goal of the oral agreement—to "build a brand of horses that would be capable of earning high breeding fees"—within a year. (*Id.* at 5). In support, Guinn asserts that the evidence establishes that it would require three to five years to build a brand of Stallions that would be capable of earning high stud fees. (*Id.*)

In response, Galyean argues that the contract was fully performable within a year because: (1) Guinn could have sold the Stallions within a year;[7] and (2) it was possible for the Stallions to yield high stud fees within a year. (Pl.'s Br. at 11–13). In support of his argument that the Stallions could yield high stud fees within a year, Galyean points to another horse that he trained and showed, Metallic Cat. (*Id.* at 11–12). Galyean urges the Court to find that Metallic Cat is an example of how, while improbable, it is possible that the agreement could have been fully performed within a year. (*Id.* at 12–13 (citing *Chacko v. Mathew*, No. 14-07-00613-CV, 2008 WL 2390486, at *7 (Tex. App.—Houston [14th Dist.] June 12, 2008)).

Additionally, and in the alternative, Galyean argues that the contract was partially performed and, thus, falls outside the statute of frauds. (*Id.* at 13–18). In support of this argument, Galyean points to three specific acts: (1) that Guinn provided him with 25% of the stud fees earned by the Stallions; (2) that Galyean built a breeding facility on his ranch; and (3) that Galyean took an aggressive strategy by discounting and comping breedings to build the Stallions' brands. (*Id.* at 16–17). Galyean asserts that these actions can only be explained by the existence of the oral

---

[7] The Court notes that Galyean has wholly abandoned the argument that he made to the jury regarding the advisory question: that the contract was fully performable within a year *because the Stallions could have died.* (*See* ECF 309 at 46). Accordingly, the Court's decision to decline to follow the advisory jury's answer on this issue is strengthened by the fact that the argument presented to the advisory jury was legally incorrect and has now been abandoned.

partnership and that they cannot be evidence of any other arrangement between the parties. (*Id.* at 16–18).

In his reply, Guinn argues that: (1) the sales provision was not found to be a part of the oral agreement; (2) Galyean misrepresented the time frame regarding Metallic Cat; (3) the partial-performance exception cannot apply because of the type of damages sought by and awarded to Galyean; and (4) even if the partial-performance exception could be applied, that there is no evidence of any performance that unequivocally evidences the existence of the partnership. (Defendant's Defenses Reply ("Def.'s Reply") at 2–8).

Having reviewed the briefs, responses, arguments, and relevant evidence, the Court, for the reasons stated below, finds that performance was not possible within a year. Consequently, the statute of frauds applies to the oral partnership. Furthermore, the Court finds that Galyean cannot properly allege the partial-performance exception to the statute of frauds. Accordingly, the Court finds that the oral partnership is unenforceable as a matter of law.

### 1. Legal Standard

The purpose of the statute of frauds is to "remove uncertainty, prevent fraudulent claims, and reduce litigation" by requiring that certain agreements be in writing and signed by the parties. *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 735 (Tex. 2018). The statute of frauds is an affirmative defense in a breach of contract suit and renders a contract that falls within its purview legally unenforceable. Tex. Bus. & Com. Code § 26.01(a); *S&I Mgmt., Inc. v. Choi*, 331 S.W.3d 849, 854 (Tex. App.—Dallas 2011, no pet.). Whether a contract falls within the statute of frauds is a question of law. *Hill*, 544 S.W.3d at 733 (Tex. 2018); *Bratcher v. Dozier*, 346 S.W.2d 795, 796 (Tex. 1961).

As relevant here, to prove the statute of frauds defense, a defendant must show that a contract does not specify the time of performance and that it cannot, by its terms or by the nature of the required acts, be performed within one year from the date of the agreement. Tex. Bus. & Com. Code § 26.01(b)(6); *see, e.g.*, *Niday v. Niday*, 643 S.W.2d 919, 920 (Tex. 1982) (finding that an oral contract to transfer a share of a business to the plaintiff if he obtained a license was subject to the statute of frauds because the licensing process required two years of training); *Fuller v. Wholesale Elec. Sup. Co.*, 631 S.W.3d 177, 183 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (finding that an oral contract to pay the plaintiff the equivalent to 2% of the company's value when the plaintiff retired was subject to the statute of frauds because the parties' language contemplated normal retirement age, not "early" retirement within a year); *Hairston v. S. Methodist Univ.*, 441 S.W.3d 327, 334–35 (Tex. App.—Dallas 2013, pet. denied) (finding that an oral scholarship agreement between a high-school sophomore and the university was subject to the statute of frauds because the student could not enroll in college until she graduated one and a half years later); *Hall v. Hall*, 308 S.W.2d 12, 15 (Tex. 1957) (finding that an oral contract to develop sales territory was subject to the statute of frauds because the development would take three years).

If the oral agreement is capable of being performed within one year, it is not precluded by the statute of frauds. *Hairston*, 441 S.W.3d at 334. However, the theoretical possibility that the contract could terminate within one year because of death or some other fortuitous event does not remove an oral agreement from the statute of frauds. *See, e.g., Sullivan v. Leor Energy* LLC, 600 F.3d 542, 547 (5th Cir. 2010) (citing *Gilliam v. Kouchoucos*, 340 S.W.2d 27, 28 (Tex. 1960)). When considering whether an oral agreement falls within the statute of frauds, the Court must determine whether the parties intended to complete the agreement within a year. *Metromarketing Servs., Inc. v. HTT Headwear, Ltd.*, 15 S.W.3d 190, 195 (Tex. App.—Houston [14th Dist.] 2000,

no pet.) (citing *Hall*, 308 S.W.2d at 16). To make such a determination, the Court looks to the intended performance, not the defeat, of the agreement. *Wewerka v. Lantron*, 174 S.W.2d 630, 633–34 (Tex. App.—Amarillo 1943, writ ref'd w.o.m.); *see also Metromarketing Servs., Inc.*, 15 S.W.3d at 196 (noting "reasonable time" for performance is based on circumstances surrounding the adoption of agreement, situation of the parties, and subject matter of the contract). The duration of the agreement "may properly be implied from extrinsic evidence." *Niday*, 643 S.W.2d at 920. If the evidence conclusively proves the alleged oral agreement cannot be completed within one year, the agreement violates the statute as a matter of law. *Id.*

### 2. Analysis

As discussed *supra*, Guinn argues that his oral partnership agreement with Galyean is unenforceable because it could not have been performed within a year. (Def.'s Br. at 3–11). In response, Galyean alleges that the Stallions could have been sold within a year and, thus, the statute of frauds does not apply. (Pl.'s Br. at 11–13). Additionally, Galyean argues that, while improbable, full performance could have been achieved within a year. (*Id.*). The Court will first address Galyean's argument that full performance was possible through the sale of the Stallions. The Court will then address whether it was possible to achieve full performance of the agreement, based on its terms, within a year.

### a. Sale of the Stallions

Again, when evaluating whether full performance could be achieved within a year, the Court must look at the terms of the contract and the nature of the required acts. Tex. Bus. & Com. Code § 26.01(b)(6); *see, e.g.*, *Niday*, 643 S.W.2d at 920 (Tex. 1982). To make such a determination, the Court looks to the terms and the intended performance, not the defeat, of the agreement. *Wewerka*, 174 S.W.2d at 633–34; *see also Chase v. Hodge,* No. 1:20-CV-00175-DH,

8

2023 WL 415153 (W.D. Tex. Jan. 24, 2023).[8]  The theoretical possibility that the contract could terminate within one year because of death or some other fortuitous event does not remove an oral agreement from the statute of frauds.  *See, e.g., Sullivan*, 600 F.3d at 547 (citing *Gilliam*, 340 S.W.2d at 28).

Based on the above, the Court must first determine whether the agreement contained a provision regarding the sale of the Stallions.  In this case, the jury found that the parties formed an oral partnership with the goal of "cultivat[ing] a brand . . . that would in turn yield high breeding fees [from the Stallions]."  (ECF 271 at 5; ECF 306 at 24; ECF 298 at Question 1).  The jury also found that the terms of the oral partnership were that Galyean would receive 50% of the prize money from competitions and 25% of the operational profits.  (*See* ECF 298 at Question 10).  Galyean now argues that he established, at trial, that the oral agreement also included a provision regarding the sale of the Stallions.  (Pl.'s Br. at 9 (stating that Galyean was entitled to 25% of the proceeds from the sale of the Stallions)).  While Galyean did argue this alleged term (ECF 306 at 151), he also alleged that the agreement included a term that Guinn "would never sell [the Stallions]."  (*See* ECF 306 at 27; ECF 271 at 2–3).  While there is no corroborative evidence— other than Galyean's own testimony—in the record to support Galyean's alleged sale provision, there is ample evidence in the record to support his assertion that Guinn agreed to never sell the Stallions.  (*See* ECF 306 at 162–64 (Guinn testifying multiple times that the Stallions "were not for sale" and that he would never sell them)).  Nevertheless, the jury did not find either of these

---

[8] *Chase* is currently pending before the 5th Circuit Court of Appeals. Based on the briefing in that case, one of the issues presented to the 5th Circuit is whether the Magistrate Judge was correct in basing his determination on the intent of the parties, or whether he should have considered every possible non-fortuitous end to the oral agreement. The Court agrees with the *Chase* Magistrate Judge's interpretation of Texas law in that in deciding whether performance was possible within a year the undersigned must look at the stated terms of the agreement, the intent of the parties, and what the parties contemplated. It is evident to the Court that to do otherwise would effectively abrogate the statute of frauds as it is difficult to imagine a scenario in which one could not come up with some way to end every oral agreement within a year.

provisions to be a part of the oral agreement. (*See generally* ECF 298). These conflicting terms—both of which were alleged by Galyean—are a perfect example of why the statute of frauds is necessary and why courts cannot consider every alleged term to be a part of an oral agreement.[9] Therefore, the Court finds that the evidence establishes that the oral agreement is silent as to the sale of the Stallions.

Thus, the Court must now determine whether the sale of the Stallions was contemplated at the time of the partnership's formation. At the hearing, to emphasize that the sale could have occurred within a year, Galyean pointed to Guinn's testimony that he "just wanted to own a good horse, and [] to win the Futurity, and the good Lord blessed me with some of the other stuff, but I was not interested in the breeding business or owning a stallion." (ECF 306 at 189). Galyean argued that if the Stallions had not been successful, then this testimony shows that Guinn would have sold them, and, thus, the partnership could have concluded within a year. As discussed above, the partnership was formed to build a brand of Stallions capable of yielding high stud fees. (ECF 306 at 24). The testimony cited by Galyean is in complete contrast with that stated purpose and, accordingly, is either proof that the partnership did not exist or is irrelevant to the Court's determination of whether the potential sale of the Stallions was contemplated by the parties at the time of the partnership's formation. Furthermore, Guinn's statement does not reference selling the Stallions, and it is speculative at best for the Court to conclude that the Stallions winning events was Guinn's test for what makes "good horse[s]," such that their failure to win immediately would lead to their sale. It is even more speculative considering both Galyean's and Guinn's trial

---

[9] The Court notes that these are not the only inconsistent facts alleged by Galyean. Just to name a few, Galyean also alleged three different formation years (2015, 2016, and 2017), three different partnership names (no partnership name, Thomas L. Guinn, and Tom & Lisa Guinn), and that the breeding facility was both unrelated to the partnership and a part of the partnership. While there are more inconsistent terms and statements, a complete list would be needlessly cumulative.

testimony that the Stallions would never be sold. (*See* ECF 306 at 27, 162–64). Accordingly, while Galyean's reliance on this testimony makes the Court question whether there was truly a meeting of the minds regarding the partnership, it does not persuade the Court that the sale of the Stallions was contemplated by the parties at the time of formation.

Therefore, because the Court must look at the terms of the agreement and the nature of the required acts to determine whether full performance was possible within a year, the potential sale of the Stallions carries no weight in the Court's determination as it was not a term of the partnership and the evidence does not show that it was contemplated by the parties at the time of the agreement.

### b. Otherwise Performable

As discussed above, the Court must look at the terms of the agreement and the nature of the required acts to determine if full performance is achievable within a year. Tex. Bus. & Com. Code § 26.01(b)(6); *see, e.g.*, *Niday*, 643 S.W.2d at 920 (Tex. 1982). Thus, the Court must determine whether it was possible, however improbable, that the parties could have "cultivate[d] a brand . . . that would in turn yield high breeding fees" within a year. *Mathew*, 2008 WL 2390486, at *7; (ECF 271 at 5; ECF 306 at 24).

Here, as discussed *supra*, Galyean asserts that Metallic Cat—another horse previously trained and shown by Galyean—is proof that it was possible to achieve the aim of the partnership within a year. (Pl.'s Br. at 11–12). In support, Galyean points to Alvin Fults[10] ("Fults")'s testimony that Metallic Cat won one of the biggest events in cutting in December 2008 and began standing stud four months later in March 2009. (ECF 306 at 80). In response, Guinn argues that Metallic Cat is actually an example of how the aim of the partnership could not have been achieved within a year. Specifically, Guinn points to Fults' testimony that: (1) "100 percent of the mares

---

[10] Alvin Fults was the first witness called at trial, is Galyean's former business partner, and was the owner of Metallic Cat until 2016.

the first year, that was in 2009, were bred free, at no charge;" (2) in the 2010 breeding season, Metallic Cat's initial fee was $5,000; and (3) Metallic Cat's fee was "5,000 for two or three years, and then we jumped to 7,500, and then we jumped to 10,000 per mare, and it was all because [Galyean] laid the foundation." (Def.'s Reply at 4–5; ECF 306 at 49, 57, 83).

Furthermore, Fults testified that Galyean's approach to building Metallic Cat's breeding reputation by comping the first year of breeding fees was "100 percent" the manner, means, and method in which to implement a profitable breeding program. (ECF 306 at 57). In fact, Galyean took the same approach to breeding the Stallions and comped or discounted their first year of breeding fees. (*See, e.g.*, ECF 307 at 48). Fults' testimony is consistent with other testimony evidence presented at trial, providing that for a stallion to yield high stud fees, he must show well at events and then, subsequently, gain a good breeding reputation through producing successful offspring. (*See* ECF 307 at 20 (Galyean testifying that to accomplish the type of success they agreed to "it would take three to five years" after "you get past the horse being a prospect"); *see also* ECF 306 at 83 (Fults testifying that it would take four to five years to make high stud fees on a horse); ECF 306 at 51 (Fults testifying that for a Stallion to receive high stud fees, he must produce "money winning foals"); ECF 306 at 82–83 (Fults testifying that to produce money winning foals it requires four to five years because: (1) horses have an eleven-month gestational period; (2) the foals do not begin their training until they are two years old; and (3) they do not begin competing until they are three years old)).

While the parties did not define "high stud fees" in their agreement, the Court concludes that the testimony related to Metallic Cat shows that it was not possible to achieve those high fees within a year. Fults testified that after a year of comped breedings, Metallic Cat—a stallion that won the biggest event in cutting, is in the cutting hall of fame, and was featured in the television

show Yellowstone—had a breeding fee of $5,000 for two or three years. (ECF 306 at 57). Metallic Cat's breeding fee then jumped to $7,500 and then eventually to $10,000. (*Id.*) Metallic Cat's timeline is consistent with the testimony presented at trial that for a stallion to receive high stud fees, he must produce money-winning foals, which takes three to five years.[11] (*See, e.g.*, ECF 306 at 51, 82–83). Thus, even assuming that Fults and Galyean could have charged the $5,000 breeding fee without comping the first year of breedings, Metallic Cat's fee increased 100% ($5,000 to $10,000) after producing money-winning foals. Because it is impossible to produce money-winning foals within a year, it was impossible—even for one of the most famous cutting horses of all time in Metallic Cat—to achieve high stud fees within a year. Therefore, because the evidence shows that the Stallions could not have charged high breeding fees the first year they stood stud, the Court finds that it was not possible for the partnership to "cultivate a brand . . . that would in turn yield high breeding fees" for the Stallions, within a year.[12] Accordingly, the Court concludes that full performance of the agreement could not be achieved within a year, and, thus, the statute of frauds applies.

### c. Partial Performance

Because the statute of frauds applies to the oral partnership, the Court must next evaluate Galyean's contention that the partial-performance exception to the statute of frauds applies. (Pl.'s Br. at 13–18). In this case, to show partial performance, Galyean points to three acts: (1) that Guinn provided him with 25% of the stud fees earned by the Stallions; (2) that Galyean built a

---

[11] Metallic Cat's first year of breedings were comped. Those foals would have begun competing four years (11-month gestational period + 3 years) later, three years after they began charging breeding fees, and directly coinciding with the price jump from $5,000 to $7,500. (ECF 306 at 57, 82–83).

[12] The evidence shows that it is questionable whether the Stallions could even charge the lower breeding fees during their first year of standing stud. (*See* ECF 306 at 48–49 (Fults testifying that mare owners "are not going to pay a breeding fee to breed to a stallion that isn't proven yet as a stallion. Yes, he's a great horse, he won a lot of money, but is he a producing stallion;" and that mare owners "are not real excited about paying for those breedings until that stallion has proven hisself.")).

breeding facility on his ranch; and (3) that Galyean took an aggressive strategy by discounting and comping breedings to build the Stallions' brands. (Pl.'s Br. at 16–17). Galyean asserts that these actions can only be explained by the existence of the oral partnership and that they cannot be evidence of any other arrangement between the parties. (*Id.* at 16–18). In response, Guinn argues that: (1) the partial-performance exception cannot be applied in this case because Galyean only sought contract damages; and (2) even if the exception could be applied, none of the above reference acts unequivocally refer "to the existence of the partnership . . . as opposed to some other business relationship between the parties." (Def.'s Reply at 7).

Partial performance applies only "if denial of performance would amount to a virtual fraud," which requires "strong evidence establishing the existence of an agreement and its terms, [that] the party acting in reliance on the contract has suffered a substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead the statute, would reap an unearned benefit." *Sullivan,* 600 F.3d at 549 (internal citation omitted). "Partial performance removes an oral agreement from the statute of frauds only if the performance is unequivocally referable to the agreement and corroborative of the fact that the contract was made." *Id.* "The performance a party relies on to remove an oral agreement from the statute of frauds 'must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced.'" *Hodge,* 2023 WL 415153, at *11 (quoting *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 439–40 (Tex. App.—Dallas 2002, pet. denied). "'If the evidence establishes that the party who performed the act that is alleged to be partial performance could have done so for some reason other than to fulfill obligations under the oral contract, the exception is unavailable.'" *Chase,* 2023 WL 415153, at *11 (quoting *Nat'l Prop. Holdings, L.P. v. Westergren,* 453 S.W.3d 419, 426–27 (Tex. 2015) (per curiam)).

The partial-performance exception requires that the party acting in reliance on the agreement suffer a substantial detriment for which there is no adequate remedy. *See, e.g., Sullivan,* 600 F.3d at 549. Thus, a party that proves that the partial-performance exception applies is only entitled to reliance damages and not contract damages. *Id.* (citing *Breezevale Ltd.,* 82 S.W.3d at 441 (holding that because Breezevale was awarded $1 million on its contract law claim, it had an adequate remedy as a matter of law, and, thus, could not assert the partial-performance exception)).

In this case, the jury awarded Galyean damages for "lost profits," and Galyean argues that applying the statute of frauds would deprive him of the benefit of his bargain. (Pl.'s Br. at 19, 22; ECF 298 at Question 13). Reliance damages are an alternative theory of recovery—meaning that a party can ultimately recover his lost profits (benefit of the bargain damages) or reliance damages, but not both. *Transverse, L.L.C. v. Iowa Wireless Servs., L.L.C.,* 617 F. App'x 272, 280 (5th Cir. 2015) (citing *Amigo Broad., LP v. Spanish Broad. Sys., Inc.,* 521 F.3d 472, 486 (5th Cir. 2008)); *see also* Restatement (Second) of Contracts § 349 (1981). Therefore, because Galyean only sought benefit-of-the-bargain damages—and, similar to the plaintiff in *Breezevale,* was awarded damages on his contract law claim—he cannot show that he suffered substantial detriment for which there is no adequate remedy. Thus, Galyean is not entitled to recovery under the partial-performance exception to the statute of frauds.[13] *See Sullivan,* 600 F.3d at 549; *see also Wade v. XTO Energy Inc.,* No. 02-12-00007-CV, 2013 WL 257361, at *17 (Tex. App.—Fort Worth Jan. 24, 2013, no pet.) (mem. op.).

---

[13] The Court notes that, at the motion hearing, Galyean offered no rebuttal to Guinn's argument that the damages sought and awarded to Galyean preclude recovery under the partial-performance exception. Furthermore, no argument was presented at the hearing regarding the three actions Galyean alleges to show partial performance. In fact, Galyean's only mention of partial performance at the hearing was to point out that the jury found that he performed under the agreement. While the jury did enter such a finding, that is not sufficient to establish that the partial-performance exception applies.

Moreover, even if Galyean could assert the partial-performance exception, the three acts that he points to are not such that they could only be evidence of the partnership. As discussed *supra*, Galyean points to the fact that: (1) Guinn provided him with 25% of the stud fees earned by the Stallions; (2) Galyean built a breeding facility on his ranch; and (3) Galyean took an aggressive strategy by discounting and comping breedings to build the Stallions' brands. (Pl.'s Br. at 16–7). The Court will address each in turn.

First, Galyean argues that the fact that Guinn paid him 25% of the stud fees earned by the Stallions can only be explained by the partnership because such a payment scheme is "unheard of in the cutting horse industry." (Pl.'s Br. at 16). In support, Galyean points to testimony, providing that it is industry custom that only a horse's owner or partial owner receives a percentage of breeding fees. (*Id.* at 16–17 (citing ECF 306 at 70, 119–20)). In response, Guinn asserts that Galyean cannot rely on oral evidence to carry his burden. (Def.'s Reply at 7 n. 5). Further, Guinn argues that he paid Galyean 25% of the stud fees because he was unfamiliar with the industry customs and offered him a commission-based payment scheme for his services. (*Id.* at 7). In support, Guinn cites to his testimony that he: (1) "had no idea what they paid a trainer that is assisting in getting mares to breed;" (2) "had no idea what the standard was;" and (3) offered a 10% commission to handle the breeding of the Stallions and that it was negotiated by Galyean up to 25%. (*Id.* (quoting ECF 306 at 172; ECF 308 at 210–12)).

It is undisputed that Guinn issued numerous payments to Galyean for 25% of the breeding fees. Thus, Galyean is not relying only on oral evidence to carry his burden. As such, the Court will now address the argument that the 25% commission can only be explained by the existence of the partnership. The evidence presented at trial shows that Guinn had little to no experience with the industry customs of the horse business. In fact, regarding this specific issue, Guinn

testified that, when it came time to breed Metallic Rebel in 2017, he offered Galyean a 10% commission to handle the breedings because "[t]hat's a sales commission you give to any salesman," and that it was eventually negotiated up to 25%. (ECF 306 at 172). Therefore, while the 25% commission payments may be unheard of in the horse industry, given the facts of this case, the Court finds that it is reasonably plausible that Guinn offered the commission because it was what he was used to and because he thought it was fair compensation for Galyean handling everything related to the breeding of the Stallions. Accordingly, the Court concludes that the 25% commission checks could be reasonably explained by some other agreement besides the partnership and, thus, it cannot be used to establish partial performance.

Second, Galyean argues that the fact that he constructed and equipped a breeding facility on his ranch can only be explained by the existence of the partnership. (Pl.'s Br. at 17). However, as Guinn points out in his reply, Galyean testified at trial that the breeding facility "was a separate – it didn't have anything to do with mine and [Guinn]'s partnership."[14] (ECF 307 at 230). Galyean now inexplicably asks the Court to find that the construction of the breeding facility—that he testified had nothing to do with the partnership—can only be explained by the existence of the partnership. The Court declines to do so and, thus, finds that the construction of the breeding facility is not such that it can only be explained by the partnership. Accordingly, Galyean has failed to establish partial performance through the construction of the breeding facility.

Finally, Galyean argues that his aggressive program of discounted and comped breedings can only be explained by the partnership because, otherwise, it would make no sense for him to give up commission on a year's worth of stud fees. (Pl.'s Br. at 17). However, Fults testified that

---

[14] Galyean also testified that he charged Guinn chute fees at the breeding facility when Guinn wanted to breed mares with the Stallions. Further Galyean testified that he collected roughly $650,000 in chute fees from just the Stallions at issue in this case, and he shared none of that with Guinn. (ECF 307 at 230).

mare owners "are not going to pay a breeding fee to breed to a stallion that isn't proven yet as a stallion. Yes, he's a great horse, he won a lot of money, but is he a producing stallion." (ECF 306 at 48–49 (also stating that mare owners "are not real excited about paying for those breedings until that stallion has proven hisself.")). Fults' testimony shows that Galyean's decision to comp the Stallions' first year of breedings cannot be viewed in a vacuum. As Guinn points out in his reply, many salesmen give away samples in order to drum up future business. (Def.'s Reply at 8). Given the overwhelming evidence that stallions must prove themselves as stallions before mare owners want to breed their mares with them and pay the higher fees, it is axiomatic that the mid- and long-term profits that Galyean would receive far outweigh the commissions that he would lose by comping the first year of breedings. Considering the business sense associated with comping the first year of breedings, paired with the evidence that it would have been difficult for Galyean to get mare owners to pay anything during that year, the Court finds that Galyean's decision to comp the Stallions' first year of breedings cannot only be explained by the existence of the partnership.[15] Therefore, Galyean has failed to establish partial performance through the comping of the Stallions' first year of breeding fees. Accordingly, the Court concludes that even if Galyean could assert the partial-performance exception, he has failed to do so.

## B.  Quasi-Estoppel

Additionally, and in the alternative, Guinn argues that the doctrine of quasi-estoppel should prevent Galyean from asserting a position (in this case, the existence of an oral partnership) that is inconsistent with those positions that he has previously taken. (Def.'s Br. at 12–16). In support, Guinn argues that, prior to this litigation, Galyean acted inconsistent with the existence of a partnership in that Galyean never represented to anyone—the government, industry groups,

---

[15] The Court also notes that the evidence presented at trial shows that Galyean comped many of the breedings to his friends and family, another explanation for such actions.

vendors, or customers—that a partnership existed. (*Id.*)  Specifically, Guinn points to the registration of the Stallions, Galyean's contemporaneous statements to his staff, all media, advertisements, and documents, and Galyean's tax returns. (*Id.*)  In response, Galyean argues that quasi-estoppel does not apply because he never acted inconsistent with the partnership *towards Guinn*, the so-called "mutuality of parties" requirement discussed *infra*.  (Pl.'s Br. at 18–25).  Additionally, and in the alternative, Galyean argues that none of the actions alleged by Guinn are inconsistent with the existence of the partnership and that Guinn was not disadvantaged by any alleged inconsistent actions. (*Id.*).  Having reviewed the briefs, arguments, and evidence, the Court, for the reasons stated below, concludes that quasi-estoppel is not applicable in this case.

Under Texas law, "[q]uasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 337 (Tex. 2020); *see also Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000).  Quasi-estoppel applies "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 778 (Tex. 2017).  Quasi-estoppel, unlike equitable estoppel, "requires no showing of misrepresentation or detrimental reliance." *Hartford Fire Ins. Co. v. Mont Belvieu*, 611 F.3d 289, 298 (5th Cir. 2010) (quoting *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied)).

Before moving on to the traditional elements of quasi-estoppel, the Court must first determine whether it is required to apply an additional element—mutuality of parties—that Galyean urges is required by Texas law.  Galyean points to a line of Texas intermediate court cases from 2012–2018 that hold that mutuality of parties precludes the assertion of estoppel when the

asserting party, which in this case is Guinn, was a stranger to the representation. *See, e.g., Parker v. Glasgow*, No. 02-15-00378-cv, 2017 WL 2686474, at *3 (Tex. App.—Fort Worth June 22, 2017, no pet.) (mem. op.).  This means that for quasi-estoppel to apply, the inconsistent positions must be between the party being estopped (Galyean), and the party asserting estoppel (Guinn), not some other third party.  *See Leyendecker v. Uribe*, No. 4-17-00163-CV, 2018 WL 442724, at *5 (Tex. App.—San Antonio Jan. 17, 2018, pet. denied).

In response, Guinn points to *Teal*, for the proposition that the Texas Supreme Court held that mutuality is not an element of quasi-estoppel.  593 S.W. 3d at 330.  Guinn further cites *MTGLQ Investors, L.P. v. Alexander*, to show that the 5th Circuit has followed *Teal*.  No. 20-20528, 2021 WL 3921418, at *3 (5th Cir. 2021).  In reviewing *Teal*, the Court finds that the Texas Supreme Court acknowledged that the appellate court chose to analyze quasi-estoppel separate from the other estoppel claims and stated that it did so because, unlike the other defenses, mutuality is not an element of quasi-estoppel.  (*Teal*, 593 S.W. 3d at 330 ("[t]he court of appeals separately considered Teal's quasi-estoppel argument because . . . the doctrine is not foreclosed by Teal's status as a stranger")).  Ultimately, the Texas Supreme Court did not address the question in its own analysis, and the case was decided on different grounds.  (*See Teal*, 593 S.W. 3d at 338 (stating that "[o]ur holding [rests] on a lack of an expressly inconsistent position.")).  Similarly, the 5th Circuit in *MTGLQ* cites *Teal* for the proposition that there was not an inconsistent position. (*See MTGLQ*, 2021 WL 3921418, at *4 (stating "Alexander fails to show that MTGLQ has ever 'assert[ed], to [her] disadvantage, a right inconsistent with a position previously taken.'" (quoting *Teal*, 593 S.W.3d at 337)).  While the Texas Supreme Court did not address the issue in its analysis, a review of the appellate court decision shows that it was the Texas Supreme Court, not the lower appellate court, that stated that the analysis was separate because mutuality is not an element for

quasi-estoppel. *See generally Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 534 S.W.3d 558 (Tex. App.—San Antonio 2017). Because the Texas Supreme Court independently inserted the reason for why the court of appeals analyzed quasi-estoppel separately, and its own analysis did not treat mutuality as an element, the Court concludes that mutuality is not a required element under Texas law.[16] Therefore, the Court will now determine whether Galyean maintained a position inconsistent with the partnership such that Guinn was disadvantaged. *See, e.g., Teal*, 593 S.W.3d at 337.

While it is undisputed that Galyean acted as if there was not a partnership with his employees, accountant, advertisers, potential customers, the public, and the government, Galyean claims that those actions were not inconsistent with the partnership because he and Guinn agreed to keep the partnership a secret and Guinn was the "majority owner" of the Stallions. (Pl.'s Br. at 21–22). Assuming without deciding that the alleged secrecy term can explain all of Galyean's other inconsistent actions, it cannot explain away his failure to file tax returns reflecting the partnership. At trial Mary Michels ("Michels"), Galyean's former public accountant from 2015-2022, testified that: (1) for all of the years at issue in this case, Galyean's entities reported the 25% payments for breeding fees as "breeding season commission income;" (2) none of Galyean's nor his entities' tax returns reflected the partnership; (3) Galyean reviewed and signed all tax returns before she filed them with the IRS; (4) she has experience handling tax returns for partnerships; (5) the Galyean's never mentioned a partnership to her; (6) in her experience the payments were not partnership payments; (7) in 2022—almost a year after this case began, and after Michels had been subpoenaed—Galyean's wife contacted her and told her that their attorneys said that they

---

[16] To the extent that the above is insufficient to find that the Texas Supreme Court has spoken on the issue of whether mutuality is a required element for quasi-estoppel, the Court makes an *Erie* Guess based on the above referenced rationale paired with the fact that the Court cannot find, and Galyean has not provided, any cases, post *Teal*, applying mutuality as an element. *See, e.g., In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007).

needed to amend the tax returns to reflect the partnership; and (8) she declined to do so because she felt it would be fraudulent to claim that a partnership existed and that they were only trying to amend the returns to affect this case. (ECF 308 at 77–112). Michels further testified that, in 2016, Galyean asked her to treat Fults' payment to him for 10% of the sale of Metallic Cat as money from the sale of a partnership asset and that she regrettably acquiesced and filed the payment as capital gains. (ECF 308 at 113–116).

Galyean urges the Court to find that his tax returns are not evidence of an inconsistent action because he relied entirely on Michels to prepare accurate returns, and she "unilaterally designated" the breeding fees as commissions rather than distributions of partnership returns. (Pl.'s Br. at 22). While Galyean may have relied on Michels to prepare his and his entities' tax returns, he had previously asked Michels to report a payment from Fults as assets from a partnership, he never corrected the designation of the payments as commissions despite his ultimate responsibility to review and sign the returns, and he never mentioned the partnership to Michels, his accountant. Therefore, the evidence shows that not only did Galyean never mention the partnership to Michels or correct her designation of the payments as commission, he—in 2016, after the partnership at issue in this case had begun—knew that partnership distributions should be filed differently and asked Michels to do so with the money that he received from Metallic Cat's sale. Accordingly, the Court is unpersuaded by Galyean's attempts to deflect the blame for filing tax returns that are inconsistent with the existence of the partnership.

Because Galyean acted inconsistent with the partnership in the filing of his taxes, the Court must now determine whether Guinn was disadvantaged by that action. *See Teal*, 593 S.W.3d at 337. Guinn alleges that, as a consequence of Galyean's actions, he was deprived of tax benefits and undertook certain administrative duties and obligations. (Def.'s Br. at 15). In light of the

22

jury's finding that Galyean and Guinn entered into an oral partnership in 2015, the Court must presume that Guinn knew of the partnership during the relevant period. Because it must be presumed that Guinn knew of the partnership, it cannot be said that any action taken by Guinn with regard to his own taxes and acceptance of responsibilities was tied to Galyean's independent tax filings. While the Court can think of a few reasons for which Guinn, who has extensive knowledge regarding the tax code, chose not to take advantage of the tax benefits of a partnership, the Court cannot discern, and Guinn has not provided, any reasonable explanation for how Guinn's personal choice regarding the filing of his taxes was caused by Galyean's inconsistent actions. Thus, it cannot be said that Guinn was unjustly disadvantaged by Galyean's fraudulent tax filings. The same is true for Guinn's acceptance of certain administrative responsibilities. Given the presumption that Guinn was aware of the partnership during the relevant period, any voluntary assumption of duties by Guinn cannot be attributed to Galyean's inconsistent positions to third parties. As such, the Court finds that the quasi-estoppel defense is not applicable in this case.

## IV.    MOTION FOR JUDGMENT ON THE VERDICT

Also, before the Court is Galyean's Motion for Judgment on Verdict [doc. 311–1]. As discussed above, the oral partnership, found by the jury, falls under the statutes of frauds and, thus, is unenforceable. Accordingly, Galyean's Motion for Judgment on Verdict [doc. 311–1] is **DENIED**.

## V.    MOTIONS FOR DECLARATORY JUDGMENT

Moreover, in this case, both parties seek declaratory judgments. (*See* ECF 311, 317). In his motion, Galyean seeks the following declaratory judgments:

1. There was a valid and enforceable partnership agreement between Plaintiff and Defendant;

2. The stallions Metallic Rebel and Rollz Royce were the property of the partnership;

3. Plaintiff Beau Galyean owned 25 percent of the partnership;

4. Defendant Thomas Guinn removed the stallions from the partnership, the partnership has no more business and the partnership has now been wound up; and

5. Beau Galyean is entitled to $4,100,000 as his share of the partnership assets.

(ECF 311 at 5).

In contrast, Guinn seeks the following declaratory judgments:

1. There was no valid and enforceable partnership agreement between Plaintiff and Defendant, and the parties do not owe ongoing duties under any such partnership; and

2. The horses that were the subject of this lawsuit are owned 100% by Defendant Tom Guinn as his personal property, not on behalf of any such alleged partnership.

(Def.'s Br. at 16).

Based on the jury verdict and the Court's above findings and conclusions, both motions for declaratory judgment [docs. 311–2, 317–2] are **DENIED IN PART** and **GRANTED IN PART**. As such, the Court holds and declares that:

a. Galyean and Guinn entered into an oral partnership with the goal of building a brand of stallion that would be capable of earning high breeding fees;

b. The terms of the oral partnership were that Galyean would manage and care for the Stallions, contribute money and property and incur losses for their care, ride the Stallions professionally, and in return, Galyean would receive reimbursement for some costs, 50% of the prize money from competitions, and 25% of the breeding fees;

c. The Stallions were the property of the partnership;

d. Guinn removed the Stallions from the partnership, the partnership has no more business, and the parties do not owe any ongoing duties under the partnership;

e. The oral partnership could not achieve full performance within a year;

f. Because full performance could not be achieved within a year, the statute of frauds applies, and thus, the oral partnership is unenforceable;

g. Because the oral partnership agreement is unenforceable, the Stallions are owned 100% by Guinn as his personal property.

## VI.    GUINN'S MOTION FOR SANCTIONS

As a final matter to be concluded, before the Court is Guinn's Amended Motion for Sanctions [doc. 233] with regard to the award of attorneys' fees and reasonable expenses related to the Court's Granting of Guinn's Motion to Compel [doc. 47].  Federal Rule of Civil Procedure ("Rule") 37(a)(5)(A) provides that "if the motion [to compel] is granted . . . the court must, . . . require the party or deponent whose conduct necessitated the motion, . . .to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."  Fed. R. Civ. P. 37(a)(5)(A).  Rule 37 also provides that the Court "must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust."  *Id.*

Here, the undersigned finds that the award of costs, including attorney's fees, under Rule 37 is unjust in light of the previous monetary sanctions imposed against Galyean for this issue, the nature of the evidence obtained, and the use of that evidence at trial.  Accordingly, Guinn's Motion for Sanctions [doc. 233], regarding the remaining issue of costs and attorney's fees, is **DENIED**.

## VII.    CONCLUSION

The Court, after a long and difficult deliberation, concludes that the correct legal result in the foregoing matter requires a take-nothing judgment in favor of the defense.  As the late Honorable Eldon B. Mahon was fond of saying: the Court must take the established facts, apply the applicable law, and "let the chips fall where they may."  This order, and the results herein, are

a direct reflection of that judicial philosophy.  This decision is not one that the undersigned enters lightly, but rather deliberately and reflectively after a full consideration of the facts and the laws applied thereto.  Let the chips fall where they may.

For the reasons set out above, on Guinn's Defenses Reserved for the Court [doc. 317–1], the Court finds that: (1) the statute of frauds applies; (2) the partial-performance exception does not apply; and (3) quasi-estoppel does not apply.  Further, the Court finds that: (1) Galyean's Motion for Judgment on the Verdict [doc. 311–1] is **DENIED**; (2) Galyean's Motion for Declaratory Judgment [doc. 311–2] is **DENIED IN PART** and **GRANTED IN PART**; (3) Guinn's Motion for Declaratory Judgment [doc. 317–2] is **DENIED IN PART** and **GRANTED IN PART**; and (4) Guinn's Supplemental Motion for Sanctions [doc. 233] is **DENIED**.

SIGNED November 17, 2023.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/jrg

26